## Merry v. Zoning Board of Adjustment

*Raymond J. Broderick*, for appellant.

*Lenard L. Wolffe* and *Gordon Cavanaugh*, Assistant City Solicitors, and *David Berger*, City Solicitor, for appellee.

WATERS, J., March 6, 1961.—This matter is before the court on appeal from the issuance by the zoning board of adjustment of a certificate for use of the subject premises as a medical center and one-family dwelling. The issue, as we see it, is whether the proposed use is one prohibited by subsection 14-203(1)(c) of the Code of General Ordinances of Philadelphia or is a use permitted by the provision of subsection 14-203(2)(c) allowing a medical center when a board of adjustment certificate is obtained.

The subject premises, 6070 City Line Avenue, are located in a district zoned "A" residential, the use restrictions applying to which are stated in section 14-203. Subsection (1)(c) of that section provides:

"(1) Use Restrictions. The specific uses permitted in this district shall be the erection, construction, alteration, or use of detached or semi-detached buildings or premises and/or land for: . . .(c) Offices of physician, dentist, minister or lawyer, Provided, that such offices may only be situated in the dwelling of such practitioner, shall be incidental to the main purpose of the residence, and not more than one assistant shall be regularly employed therein, and no colleagues or associates shall use such office."

Subsection (2)(c) of the same section provides:

"(2) The following non-residential uses shall be permitted only if a Board of Adjustment certificate is obtained: . . .(c) Medical and surgical hospitals, medical centers, and sanitaria other than for contagious disease; eleemosynary and public institutions (other than correctional)."

Since June 26, 1947, the subject premises have been used as a one-family dwelling and a dentist's office, under a permit issued on that date by the zoning board of adjustment. Application no. 57543-F was made on December 5, 1958, for a permit to use the premises

"for a dental office incidental to the main purpose of residence and four physicians' offices not incidental to the main purpose of residence and one family." The zoning administrator refused such a permit. The applicant appealed to the zoning board of adjustment, which, after a public hearing, affirmed the action of the zoning administrator. On the applicant's appeal, the zoning board of adjustment certified the record to this court, including findings of fact and conclusions of law indicating that the matter had been considered as a request for a variance, that no unnecessary hardship existed such as to warrant the grant of a variance from the zoning regulations, that "the health, safety and welfare of the immediate neighborhood would be adversely affected if a use registration permit were granted to this applicant for four physicians' offices," and that "the proposed use would be contrary to the public interest in that it would constitute a commercial inroad upon this predominantly residential area."

The merits of that appeal never came before this court for consideration. The matter appeared on the summer list on July 28, 1959, at which time the judge then presiding, at the request of applicant (the then appellant), remanded the record to the zoning board of adjustment to afford applicant an opportunity to present her theory that the requested use constituted a medical center, which, by the provisions of section 14-203 (2) (c) of the code, would require not a variance but a zoning board of adjustment certificate.

The board held further hearings, at which applicant presented testimony and argument to convince the board that the proposed use does constitute a medical center and that the criteria set out in the code for the issuance of a certificate have been met. A majority of the six members of the board were so convinced. By a vote of four to two the board decided in favor of applicant. They did not, however, issue a certificate

forthwith on the application that was before them. Instead, they requested applicant, through her counsel, to file a new application "setting forth the use of this property as a dwelling and medical center." This request, dated May 11, 1960, is part of the record before us. Applicant did file a new application with the zoning administrator, this time for a medical center and one-family dwelling. This application, undated, is no. 79443-F. It was approved by the board without further hearing and a certificate of exception was issued by the board on May 16, 1960. From that action of the board we have the present appeal, brought by neighboring residents who had from the outset appeared as protestants before the zoning board. By stipulation of counsel the owner of the subject premises has intervened as an appellee.

It is well settled, as most recently repeated in Lance Appeal, 399 Pa. 311 (1960), that the scope of judicial review on appeal from a decision of a zoning board of adjustment, where the court does not take additional testimony, is limited to determination whether the board abused its discretion or committed an error of law. It is our opinion that in this case the board has done both.

Whether a proposed use, as factually described in the application and the testimony, falls within a given categorization contained in the zoning regulations is a question of law, on which the zoning board's determination is subject to review. Thus, the use of land for a church cemetery has been held not to be included in educational, religious and philanthropic uses: Russian Orthodox Church Appeal, 397 Pa. 126 (1959). Farming includes not only operation of a greenhouse and nursery (Marple Township v. Lynam, 151 Pa. Superior Ct. 288 (1943)), but the manufacture of artificial compost: Gaspari v. Muhlenberg Township Board of Adjustment, 392 Pa. 7 (1958). The use of a

building for a car wash brings it within the same general character as garages and uses customarily accessory and incidental thereto: Novello v. Zoning Board of Adjustment, 384 Pa. 294 (1956). Examples are numerous. In the same way, we have here to decide whether the board was right in deciding that the use of the subject premises, as proposed, for a one-family dwelling, dentist's office and four physicians' offices, brings it within the category of a medical center.

What is a medical center? We do not hesitate over the word medical, but give our first attention to what is meant by a center. The word is one which is coming into more and more frequent use in urban and suburban development. We have seen the rise of the so-called community centers, shopping centers, and industrial centers, in and about our large cities. We have communities and parts of communities which are spoken of as art centers or as manufacturing centers. Colleges and schools are called centers of learning, and large corporations and the government itself have laboratories which they refer to as research centers. In Philadelphia, we have a food distribution center, we have recreational centers and bowling centers, even correctional and diagnostic centers. These and many other illustrations might be cited of uses of the word. The list seems interminable, and the uses vary widely. Shakespeare applied the word center to the whole world, in Troilus & Cressida, when he put into the mouth of Ulysses the lines:

"The heavens themselves, the planets and this
   centre,
Observe degree, priority, and place."

Nor do we lack illustrations of the use of the expression medical center. We cannot help noticing the existence in Philadelphia of a number of institutions calling themselves medical centers. Among them are the Albert

Einstein Medical Center, Temple University Medical Center, and St. Luke's & Children's Medical Center, all of which are what we traditionally know as hospitals, and all of which combine medical education with diagnosis, care and treatment of patients. We have in Philadelphia such institutions as the Sidney Hillman Medical Center of the Male Apparel Industry at 2116 Chestnut Street, and the AFL Medical Center at 1326 Vine Street. The term medical center is also sometimes used more figuratively of the community itself, as when we speak proudly of Philadelphia as one of the world's foremost medical centers.

The only dictionary definitions that have been called to our attention or that we have been able to find are those contained in Blakiston's New Gould Medical Dictionary (2nd ed., 1956), which are: "1. A medical clinic usually serving a discrete geographical area. 2. A group of medical facilities incorporating all the medical specialties and possessing the capacity for medical education and diagnosis, care and treatment of patients." The labor unions' centers mentioned above seem to fit the first of these definitions, while the second more aptly describes Einstein, Temple and St. Luke's.

We have many definitions of a center, the most apt of which is that it is a place in or around which things of like kind or people with common objects and interests group themselves. But in view of the expanding use of the word center which we have already noticed, we must remember that a definition, to be satisfactory, can never be regarded as a procrustean bed into which usage can be cramped or stretched to fit. To the contrary, as usage develops your true definition expands or contracts to fit the changing concept. On the other hand, multiplication of illustrations without precise definition is not always rewarding. We must often make use of both in our approach to true meaning. An illustration is not a definition, nor is it always an ac-

ceptable argument; but, as Tristram Shandy remarked, neither is the wiping of a looking-glass clean as a syllogism, but it does enable one to see better.

In our search for the meaning of medical center, we have nowhere, outside the testimony in this case, seen the term applied to a building which merely offers space for rent by physicians and dentists. Yet this is what applicant proposes, a former dwelling house, remodeled so as to be used by herself for living quarters and to accommodate one dentist and four physicians, each occupying his own quarters, each practicing his profession independently of the others, with no more community of interest or activity than would be shared by any two physicians who would happen to rent adjoining suites in the Medical Arts Building, the Medical Tower, or any other building.

We cannot accept as authoritative the statement of applicant's witness, Professor Davidoff, as the board apparently did, that, as soon as a building houses more than one physician's office, it becomes a medical center. It is too pat, too obviously framed to fit the facts at hand. Without attempting further at this time to define the term exactly, we hold with the minority view, as expressed in the opinion signed by Chairman Power, that "for a medical center to exist, it would seem that there should be some central control; some unification and some form of association among the physicians using the premises," which from the testimony is completely lacking in the instant case.

This seems to us, also, to follow the history of the adoption of the pertinent zoning regulations in city council. Section 14-203 (1) of the code, as it stood before the 1957 amendments, allowed, in subsection (c), in an "A" residential district, "office of physician, dentist, or other professional person when situated in the dwelling of such physician, dentist, or other professional person and incidental to the main purpose of

residence"; and, in subsection (g), "hospitals, sanitaria, eleemosynary and public institutions (other than correctional), provided any such use is not prejudicial to the public health or welfare."

As amended in 1957, subsection 14-203(1)(c) allows "Offices of physician, dentist, minister or lawyer, Provided, that such offices may only be situated in the dwelling of such practitioner, shall be incidental to the main purpose of the residence, and not more than one assistant shall be regularly employed therein, and no colleagues or associates shall use such office"; and subsection (2)(c), formerly subsection (1)(g), allows "Medical and surgical hospitals, medical centers, and sanitaria other than for contagious disease; eleemosynary and public institutions (other than correctional)," when a zoning board certificate is obtained.

It is clear to us that council's intention was to continue to exclude commercial uses and to preserve the prohibition against the maintenance of professional offices in "A" residential districts except by the practitioner in his own residence and except as incidental to the main residential purpose of the dwelling; and it is equally clear that the reference to medical centers as being permitted when meeting the requirements for a certificate was to institutions ejusdem generis, such as medical and surgical hospitals, sanitaria, and eleemosynary and public institutions. In holding to the contrary, we think the board committed an error of law.

We cannot avoid noting in the record before us the conclusions contained in the original findings of the board, dated October 27, 1959, and contrasting them with those in the board's supplemental findings dated September 27, 1960. The testimony had developed no change in the use proposed to be made of the premises. The findings of fact are identical, save for the majority's adoption of the term medical center as applicable

to the use proposed. Nevertheless, in justification of the issuance of a certificate, a complete about-face has been made in the conclusions of law. Where the board earlier concluded "(6) That the proposed use would be contrary to public interest, in that it would constitute a commercial inroad upon this predominantly residential area," and "(7) That the health, safety and welfare of the immediate neighborhood would be adversely affected if a use registration permit were granted to this applicant for four physicians' offices," the majority now conclude: "6. That the health, morals, safety and general welfare of the immediate neighborhood would not in any way be affected by the granting of a zoning board of adjustment certificate for the use of this property as a medical center."

We think the board abused its discretion in reaching an opposite conclusion by the expedient of changing a name and calling a thing something which it is not, by putting the tag of medical center on a use which remains what it was in the beginning, the renting of office space to four physicians in a private dwelling. Such use in an "A" residential district, by whatever name it is called, needs a variance, and the board has rightly held from the beginning that the requirements for the grant of a variance have not been met.

The earlier appeal by applicant we now regard as moot, her original application having been withdrawn and a new application substituted; though we may say that if that appeal were presently before us we would affirm the board's refusal of a variance. The present appeal by protestants from the board's issuance of a certificate of exception we sustain, for the reasons herein stated.

*Order*

And now, to wit, March 6, 1961, the within appeal is sustained, and the action of the zoning board of

adjustment in issuing a certificate of exception for use as a medical center and one-family dwelling is reversed.