## Mignatti Construction Company, Inc.'s Zoning Application.

Argued May 5, 1971, before President Judge Bow-MAN and Judges CRUMLISH, JR., KRAMER, WILKINSON. JR., MANDERINO, MENCER and ROGERS.

244

*Jeffrey F. Bahls*, with him *C. William Freed, Jr.* and *Freed & Freed*, for appellants.

*Paul W. Callahan*, with him *William F. Fox* and *Fox, Differ, Mazer & Callahan*, for appellee.

OPINION PER CURIAM, September 14, 1971:

This case is a zoning appeal from a decision of the Bucks County Court of Common Pleas, dated November 23, 1970, after it had heard the matter *en banc*, reversing a decision of the Bucks County Zoning Hearing Board.

Recognizing that the trier of fact is uniquely situated to best resolve questions of credibility, we nevertheless conclude that the lower court has correctly decided this case. We therefore adopt the able opinion of Judge GARB but feel compelled to comment on two cases advanced by appellants:

(1) *Blair v. Board of Adjustment*, 403 Pa. 105, 169 A. 2d 49 (1961), where the Supreme Court approved consideration of ". . . the effect of the proposed use upon the character of the immediate neighborhood so as to conserve the value of existing buildings and encourage the most appropriate use of the land." The Court there dealt with the cluttering overkill of five service stations within 350 feet of one another. Here, "West Rockhill Township is primarily a rural community with a large portion of its area consisting of open undeveloped land and forest. Approximately 3,-987 acres, or 37% of the township area is forested. Most of this forest land is situated in the northern and northwestern areas of the township [the subject property is in the south-central portion of the township].

The southern portion of the township contains most of the agricultural land. Developed land (land devoted to housing, commerce, industry, and public and semi-public uses) accounts for only about 1,158 acres [the total township area is 10,786 acres], or 10% of the total township area." This description from the West Rockhill Township Development Plan, page 16, was written in 1961, and, although somewhat dated, fairly approximates the township's character today. Because of imperfect sub-soil drainage, agriculture is difficult in the township. Forty percent of the township, including the subject property, is zoned Residential-Agriculture. Only within this classified area is quarrying permitted, and the then applicable Section 310-b of the zoning ordinance stated as one of the purposes of such a classification "to provide alternative land uses for farmers who have chosen to discontinue agriculture as a source of income, and to provide areas for necessary land uses, *such as extractive industries,* which by the nature of their operation involve large land areas and which otherwise would interfere with land development in areas of more intense usage." (Emphasis added.) The "Future Land Use" section of the Development Plan also suggested, among other things, a sanitary land fill operation for the general area in question.

We note, however, that the communities of Tylersport, Montgomery County, and Naceville, Montgomery-Bucks County (with approximate populations of 300 and 35 respectively), lie within one-half mile of the proposed quarry site to the southeast and, with the prevailing wind direction from the northwest nine months of the year, are particularly susceptible to noise and dust pollution should Mignatti's precautionary efforts fail. Nevertheless, considering the relative location of the proposed site and the general character of the area, when "[i]t is the conclusion of the Board that

the applicant has met, or could meet, all of the requirements of the ordinance," we agree with appellee that "[i]t is inconsistent on the one hand to regulate on the basis that the use is not to be permitted in a densely developed area and on the other hand to deny the use in a rural area on the basis that the activity is inconsistent with a rural area."

(2) *Caldwell v. Northampton Township Zoning Board of Adjustment,* 18 Bucks Co. L. Rep. 573 (1968), 1 Pa. Commonwealth Ct. 222, 273 A. 2d 557 (1971), where this court determined that sufficient evidence was presented to the Board to justify its refusal to grant the requested special exception. There the Board found *a failure to meet ordinance standards* in that there was no evidence of the adequacy of the water supply to the premises, no percolation evidence, no evidence submitted concerning design and capabilities of a sewage disposal plant, and no evidence that a sewage disposal system had been submitted to or approved by the proper public authorities. It was also determined that the project was to be constructed on a rear lot in violation of zoning ordinance frontage requirements. Here the Board specifically found that appellee has met or could meet all of the requirements of the applicable zoning ordinance.

The appeal is dismissed and the order of the lower court is affirmed upon the opinion of Judge GARB, written for the Court of Common Pleas of Bucks County, reported at 20 Bucks Co. L. Rep. 481 (1970).

Judge GARB's opinion follows:

"Appellant herein filed an application with the Bucks County Zoning Hearing Board requesting a special exception to permit the use of a certain 80.6 acre parcel of land as a stone quarry. The tract in question is located in West Rockhill Township, Bucks County, Pennsylvania in an area zoned RA Residential Agri-

cultural. Appellant has the property under agreement of sale which is conditioned upon obtaining the proper zoning approval for the purpose of operation of a stone quarry. Hearings were held before the board on August 13, September 2nd, September 24th, October 8th and October 22nd, 1969. Following the foregoing hearings in which extensive testimony was taken, the board filed findings of fact, conclusions of law and a legal discussion culminating in the denial of the application. It is from this denial of the application that the present appeal has been taken by virtue of a writ of certiorari issued by this court to the Bucks County Hearing Board. Intervenors herein have been permitted to intervene in support of the determination of the Zoning Hearing Board. Intervenors are a group of residents and taxpayers of West Rockhill Township.

"The property in question contains 80.6 acres and for the most part is unimproved. As noted, it is situate in an RA Residential Agricultural district in which the use as a stone quarry is allowed by special exception pursuant to Section 405(55) of the Bucks County Zoning Ordinance.

"Appellant has the property under an agreement of sale, it being a 'conditional-lease-purchase' type agreement, the condition being that the proper zoning approval be obtained before the sale may be consummated. As such, it has conducted various tests, analyses and research upon the property directed to the type of rock situate thereon and the efficacy of excavating same. It has likewise conducted various surveys to determine the feasibility of economically extracting the raw materials to be found thereon. As such, it has standing to make the application for the special exception and to prosecute this appeal. National Land and Investment Company v. Easttown Township Board of Adjustment, 419 Pa. 504, [215 A. 2d 597]

(1965). Although initially appellant herein asserted the right to the proposed use on the basis of an alleged nonconforming use, it is our understanding that this contention has now been abandoned. Therefore, we do not decide that question herein.

"A special exception must be allowed where the facts and conditions as detailed in the zoning ordinance as those upon which an exception may be permitted are found to exist. Jacobi v. Zoning Board of Adjustment, 413 Pa. 286, [196 A. 2d 742] (1964) and Rieder Appeal, 410 Pa. 420, [188 A. 2d 756] (1963). Once the requisite facts and conditions as set forth in the zoning ordinance are found to exist, the applicant is entitled to a special exception, unless there is legally sufficient competent evidence to support a finding that the grant of such an exception is adverse to the public interest. Good Fellowship Ambulance Club's Appeal, 406 Pa. 465, [178 A. 2d 578] (1962).

"The court held no hearing and therefore made no independent findings of fact. Therefore, we may not properly make our own findings of fact but can only review the decision of the board to determine if an abuse of discretion or an error of law has been committed. Concord Township Appeal, 439 Pa. 466, [268 A. 2d 765] (1970). We are relegated solely to the record of the Zoning Hearing Board and we may decide only whether the said board clearly abused its discretion or committed an error of law. Upper Providence Township Appeal, 414 Pa. 46, [198 A. 2d 522] (1964); Rieder Appeal, supra; Brennan v. Zoning Board of Adjustment, 409 Pa. 376, [187 A. 2d 180] (1963).

"In its findings the board found that the proposed use was one permissible within the zoning district in question by special exception and found that the various conditions as set forth in the zoning ordinance could be met by the appellant in its proposed use. The

application was denied, however, on the grounds that the proposed use would be detrimental to the safety, morals and public welfare of the community. In short, the board found that the use was adverse to the public interest. The burden of proving such adverse effect is upon those who assert it, in this case the intervenors, and not upon the appellant. Delaware County Community College Appeal, 435 Pa. 264, [254 A. 2d 641] (1969) and Temple University v. Zoning Board of Adjustment, 414 Pa. 191, [199 A. 2d 415] (1964).

"In denying the application for special exception the Zoning Hearing Board found that the proposed use would be detrimental to the public interest for five general reasons. These reasons were (1) the effect of the quarry on land values and on future development of the township; (2) the effect of the quarry on the need for future public services; (3) the effect of the quarry with regard to water, air and noise pollution; (4) the effect of the quarry on the water table as that [a]ffects both wells and septic systems; and (5) the effect of the quarry operation with relation to the present traffic patterns in the area. Although there is support in the record for these findings we are of the opinion that taken either collectively or individually they are insufficient in law to sustain the denial of this application for special exception. Accordingly, we must find that on this record the Zoning Hearing Board abused its discretion in denying the application and must be reversed.

"The board found that the quarry's existence would tend to depress residential land value within the immediate area, finding of fact No. 37, and that the introduction of the quarry, in finding No. 43, would retard future residential development within that surrounding area where the quarry would be seen, smelled, heard, felt or where the dust would settle. Little elaboration

is necessary upon the basic premise that a change in the character of the residential area or a slight damaging effect on real estate values cannot justify a denial of a special exception. Archbishop O'Hara's Appeal, 389 Pa. 35, [131 A. 2d 587] (1957). Neither esthetic reasons, nor the conservation of property values or the stabilization of economic values in a township are, singly or combined, sufficient to promote the health, morals or safety of the community. Medinger Appeal, 377 Pa. 217, [104 A. 2d 118] (1954) and Archbishop O'Hara's Appeal, supra.

"Ancillary to the foregoing reason, the board likewise found, in finding of fact No. 42, that the quarry use is not compatible within a residential use, the predominant and best use of the land within the subject area being residential agricultural. We totally fail to comprehend how this reason can be a justification for denial of this application inasmuch as a quarrying use is an allowable use within this zoning district by special exception. Therefore, by basing its ultimate decision in any way upon this finding, the Zoning Hearing Board in fact is arrogating to itself the legislative power of the governing body which they may not do.

"The board, in finding No. 36, found that the proposed use would be economically disadvantageous to the township and community as a whole, since it would require more services in terms of roadwork and police protection, while returning less revenue to the community than non-quarry use. With the exception of the possible effects on the road network, there is very little evidence in this record to support a finding that this use of the land would require more service in terms of police protection than would any of the other permissible uses within this zoning district. Likewise, there is very little, if any, evidence to show that the tax revenues produced by the proposed use would not outweigh

the cost of police protection or road maintenance. Be that as it may, however, and even accepting this finding we do not believe that this consideration is a justification for a denial to a property owner of the lawful use of his land. It is now clear that zoning may not be used to avoid the increased responsibilities and economic burdens which time and natural growth invariably bring. Concord Township Appeal, supra; National Land and Investment Company v. Easttown Township Board of Adjustment, supra; Delaware County Community College Appeal, supra; and Lower Merion Township v. Enokay, Inc., 427 Pa. 128, [233 A. 2d 883] (1967). Admittedly, the use of this land for the proposed purpose will require increased police protection, will impose a somewhat heavier burden on the road network, and will require an increase in all of the municipal services over what is now necessary for the support of what is primarily vacant and unused ground. However, any use of this ground would impose some increased burden upon the municipality but to deny the lawful use of the land on this basis would be a palpable invasion of the rights of the property holder and a clearly arbitrary abuse of discretion. The power to regulate the use of property does not extend to an arbitrary, unnecessary or unreasonable intermeddling with private ownership of property even though such acts may be labeled for the preservation of health, safety and general welfare. The exercise must have some substantial relation to the public good within the spheres held proper. It must not be from an arbitrary desire to resist the natural operation of economic laws or for purely esthetic considerations. Medinger Appeal, supra; White's Appeal, 287 Pa. 259, [134 A. 409] (1926).

"In finding of fact No. 30, the board found that excess water from the operation is to be channeled to an

existing ditch, then into a distribution box and then to an existing stream. All of this is well supported on the record. However, the board further found that this method is unsatisfactory in that dirty and polluted water will be allowed into a ditch which is dry most of the year. The waste water from the quarry operation would be diluted only during very wet periods. The latter part of this finding is totally unsupported by the evidence in this record. The only evidence of any dirty or polluted water was some very vague, speculative testimony that some of the machinery may on occasion drip oil or grease upon the ground which may be picked up by the water. However, this was entirely speculative and in any event the quantities almost infinitesimal. The testimony in this record would indicate that there would be very little waste water from the dust suppression system and no evidence that even this water would be of a polluted nature. Therefore, this finding being unsupported on the record, cannot form a basis upon which to deny this application. In any event, even if there were some possible danger of pollution this could be controlled by conditions imposed upon the grant of the application and if not complied with controlled through the remedial provisions of the zoning ordinance or in a court of equity if actual pollution occurred.

"Further with regard to pollution, the Zoning Hearing Board found in finding No. 31, that the proposed crusher would be located not less than 250 feet from the nearest property line and that 'applicant's statement that the noise of the crusher will not radiate beyond the property line is not accepted.' The only testimony with regard to the noise of the crusher was from the applicant's witness who testified as noted in this finding of fact. It was further testified that both the distance and the screening of trees to be planted

along the property line would muffle the sound of the stone crusher. In any event, the mere fact that the sound of the crusher may radiate some distance beyond the property lines, once again, does not form a basis for the denial of this application. Certainly a property owner has a right to generate some noise in the lawful use of his property even though that noise may transcend his own property lines. Bedminster Township v. Vargo Dragway, Inc., 434 Pa. 100, [253 A. 2d 659] (1969). There is nothing here to indicate that the noise generated would be unreasonable. Furthermore, this zoning ordinance in these relevant sections provides for certain levels of allowable noise. This being the case, the degree of noise can be controlled by the conditions imposed by the zoning ordinance itself or by other conditions imposed by the Zoning Hearing Board on the grant of the special exception. However, the mere finding that some noise generated will permeate beyond the property lines is hardly a basis for denying a lawful use of the property.

"In finding No. 40 the board found that the rock to be quarried and crushed is of relatively fine grain with a high percentage of silt and would be dust producing. Once again, we would note that the zoning ordinance itself provides for the amount of dust allowable in a quarry operation in this district. The Zoning Hearing Board has every right to insist upon compliance with the conditions of the zoning ordinance and has legal and adequate remedies within that ordinance to enforce these conditions. The applicant testified as to its intention of acquiring a dust suppression mechanism to control the dust created. There was no evidence presented to show that the dust suppression machinery would not be adequate to control the dust so that it would not exceed the levels permissible by the zoning ordinance itself.

"In finding No. 39 the board found the construction of the proposed quarry would tend to lower the water table within the surrounding area. Lowering the water table would adversely [a]ffect both wells and septic systems. There was testimony on behalf of the intervenors that if the depth of the quarry were to exceed 50 or 60 feet there conceivably would be some effect upon the water table which would have a direct effect upon the wells and septic systems in the area. However, even this witness admitted that this was entirely speculative and that whether or not this would eventuate would only be known upon the digging of the hole. Even at that, he agreed that quarrying to a level of 50 or 60 feet would not have this deleterious effect. He agreed with the testimony offered on behalf of the appellant that the fractures are tight, although not cemented together, but that because of their tightness there would be very little seepage into the quarry. It was the testimony offered on behalf of the appellant that where there was seepage the fractures could be cemented to shut them off. Even the geologist for the intervenors testified that the effect of the quarry operation on the surrounding water table can be minimized to some extent. Apparently based upon this testimony the board made finding No. 32, which is somewhat remarkable in light of its finding No. 39 heretofore related. In finding No. 32 the board found as follows: 'If the domestic wells within the area were affected by the proposed quarry, the applicant could take certain remedial action to prevent the flow of underground water into the quarry pit (such as cementing the openings in the rock strata). This action is not 100% effective so far as the wells are concerned.' Based on the evidence elicited in these hearings and the findings of the board apparently based upon that evidence, we cannot conclude that these findings represent or

indicate such a substantial or definitive effect upon the public welfare as to justify a denial of this application.

"Finally, and perhaps of greatest significance, the board found an adverse public effect by virtue of the traffic to be engendered by this quarry use. The record shows that it is contemplated that there would be approximately 25 truckloads of gravel per day taken from the quarry. In finding No. 10 the board found that the trucks which would be used have a width of eight feet and a total weight in excess of 73,000 pounds. In finding No. 11 the board finds that the existing roads in the area, Shady Lane, Ridge Road, Allentown Road and County Line Road, are not capable because of width and construction, to handle adequately the volume of truck traffic that would be created by the quarry operation, or to withstand the weight of the loaded vehicles. Finding No. 13 provides that in order to provide for the reasonably safe movement of the quarry vehicles through the area, extensive widening, straightening and levelling of the existing roads would have to be accomplished. It is further found in finding No. 13 that the intersections at Shady Lane and County Line Road, Ridge Road and County Line Road, Ridge Road and Allentown Road, and Allentown Road and County Line Road, are inadequate to permit turning movements of the five axle 73,000 pound vehicles with reasonable safety. It is found in finding No. 34 that as a stone surfaced road, Shady Lane would be inadequate as the sole means of access to the proposed quarry. The board found that Shady Lane from County Line Road affords the only access to the tract in question. This is presently an unimproved stone road. County Line Road was found to have a legal right of way of 33 feet with a macadam surface of approximately 17 feet, Ridge Road with a macadam surface of approximately

18 to 19 feet in width, and Allentown Road with a macadam surface of 20 feet and a legal right of way of 33 feet.

"Initially, it should be noted that there is no evidence to show that the overall size of these trucks exceeds that permissible on the highways of this Commonwealth. Furthermore, with the exception of Shady Lane, it is clear that these trucks with a width of 8 feet are physically able to traverse all of the highways in question. The approximate weight of the vehicle does not exceed that permissible by the Motor Vehicle Code of this Commonwealth, see the Act of August 13, 1963, P. L. 761, §2, 75 P.S. 903. The applicant has agreed to widen the cartway of Shady Lane to 20 feet, although apparently it is to remain a gravel surfaced road rather than hard surfaced. Additionally, the board found in finding No. 44 that within the one mile radius of the proposed quarry more than twenty-five school children wait for the school buses daily.

"Where the use applied for is allowable by special exception, it must be contemplated that the use would cause some increase in traffic. However, in order to find that an increase in traffic can justify a denial of a special exception, it must be shown that the increase is of such character as to bear a substantial relation to the health and safety of the community, or a high degree of probability that such an increase would adversely [a]ffect the health and safety of the community. Achbishop O'Hara's Appeal, supra. Recognizing that the application will result in some increased traffic, noise, dust and other similar inconveniences, that factor alone cannot deny the use contemplated because many of the allowable and contemplated uses within the zoning district obviously contemplate increased traffic and these other noted inconveniences. Rolling Green Golf Club Case, 374 Pa. 450, [97 A. 2d 523]

(1953). Of course there are situations where an increase in traffic will justify the refusal of a special exception. However such increase must be of such character as to bear substantial relation to the health and safety of the community. It must be recognized that many of the permitted uses not requiring special exception would have the effect of increase in traffic as well. Sun Oil Co. v. Warminster Township Zoning Board of Adjustment, 15 Bucks Co. L. Rep. 464 (1965). Although there may be an increase in traffic, there must be a high degree of probability of causing a serious detriment to the community. In contemporary society development and progress are likely to bring with them increased traffic, but this, standing alone, is not sufficient to justify [the refusal of] an otherwise lawful use of property. Delaware County Community College Appeal, supra.

"Bearing these standards in mind we are not satisfied that the increase in traffic as shown on this record is of such character as to bear a substantial relation to the health and safety of the community or a high degree of probability that such an increase will adversely affect the health and safety of the community. True enough, some dust will be generated by these trucks, but only one of the roads in question is of soft surface. Conceivably that matter can be corrected by a condition to the grant of the application. The volume of traffic in relation to the traffic on these roads prior to this use is almost insignificant. The size and weight of the trucks, as heretofore noted, conform with the present law. If there is some expense occasioned to the municipality by reason of the necessary widening of the streets that is not a valid consideration to support the deprivation of this land use. Any use of the land would require such services. Archbishop O'Hara's Appeal, supra. Any increase in traffic, and perhaps in

particular by virtue of the large size of these trucks, would represent some added risk to the safety of the school children awaiting school buses. However, we are not convinced on this record of the high degree of probability of any clear and present danger to these school children by virtue of these trucks now being introduced to this highway network. In short, we are not satisfied that the increase in traffic is sufficient to meet the standard set forth in Archbishop O'Hara's Appeal, supra:

"While we may have a great deal of sympathy for the residents in the immediate area of this proposed quarry in their opposition to it, we do not believe that the findings of this board based upon the evidence as heard, are sufficient to justify a denial of this special exception. Most of the reasons for the denial, as heretofore indicated, are anticipated conditions that can be controlled through the use of the zoning ordinance itself by virtue of the conditions set forth for the issuance of special exceptions or by use of the inherent right in the municipality to restrain and eliminate any noxious use of land. The Zoning Board may not arrogate to itself the power of a court of equity or of a public health board. It is the duty of the board to consider applications for special exception and to grant them when the terms and conditions as set forth in the ordinance have been met and when there has been no showing of an adverse public effect. The board agrees that the terms and conditions of the zoning ordinance have been met. We find, based upon the findings of fact of the Zoning Hearing Board, that the requisite public detriment has not been shown. Accordingly, this matter must be remanded to the Zoning Hearing Board with the direction that the special exception applied for be granted upon such terms and conditions as the board may deem appropriate subsequent to whatever further proceedings may be necessary."